## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

WILLIS TOWERS WATSON
SOUTHEAST, INC, a Tennessee
corporation

    Plaintiff,

      vs.

ALLIANT INSURANCE SERVICES, INC.,
a California corporation, JOHN T.
THOMAS, ANDREW BENNETT and
JENNIFER BOYERS GULLETT

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 3:22-CV-00277**

**<u>VERIFIED COMPLAINT</u>**

NOW COMES Plaintiff, Willis Towers Watson Southeast, Inc. ("Plaintiff" or "WTW SE"), by and through its undersigned counsel, and hereby files this Verified Complaint for injunctive relief and damages against Defendants Alliant Insurance Services, Inc. ("Alliant"), John T. Thomas ("Thomas"), Andrew Bennett ("Bennett"), Jennifer Gullett ("Gullett"). Thomas, Bennett and Gullett are collectively referred to as the "Individual Defendants," and along with Alliant, are collectively referred to as the "Defendants." For its causes of action against Defendants, Plaintiff states and alleges as follows:

### <u>NATURE OF THE CASE</u>

1.    WTW SE and Alliant are competing insurance brokers. This lawsuit arises out of Alliant's effort to illegally harm WTW SE's highly specialized, Charlotte-based Surety Practice. In concert with Alliant, the Individual Defendants are breaching their valid and reasonable restrictive covenants.

1

2.     Specifically, Alliant and the Individual Defendants conspired to unlawfully poach WTW SE's employees and clients. Specifically, on June 13, 2022, Thomas and Bennett resigned suddenly, simultaneously, and without notice, which violated their contractual requirement to 15 days-notice of resignation. They both immediately went to work for Alliant. The very same day, on June 13, 2022, Defendants began to improperly solicit three of WTW SE's other Surety Practice employees to join them at Alliant.

3.     Gullett is still an employee in the Surety Practice of WTW SE (although she has been out of the office and on paid disability leave since November 2020). However, on June 17, 2022, WTW SE learned that Gullett is now working at Alliant with Thomas and Bennett.

4.     Between June 14 and 17, 2022, nine long-standing clients of WTW SE -- clients whom the Individual Defendants serviced at WTW SE, advised WTW SE through their insurers that they were moving their surety business to Alliant. One of those clients advised WTW SE that it intended to work with Thomas at Alliant.

5.     Yesterday, June 20, 2022, David Jackson, President of Interstate Roofing, a current P&C and Surety Practice client of WTW SE, advised that the "new boss" at Alliant for Bennet, who worked on the Interstate Roofing account while he was at WTW SE, called him last week. Mr. Jackson implied that the call was to solicit Interstate Roofing to move its business from WTW SE to Alliant. Mr. Jackson further advised that Gullett, who worked with Interstate Roofing in the past for WTW SE, called him yesterday, June 20, 2022, and Mr. Jackson implied that her call was also to solicit Interstate Roofing to move its business from WTW SE to Alliant.

2

6.      This is not a non-compete case. Rather, this case involves narrow non-solicitation covenants, under which the Individual Defendants agreed that for two years, they would not solicit, accept business from, or provide services to clients of WTW SE whom they served or with whom they had contact during their employment with WTW SE.

7.      Although its investigation is continuing, WTW SE has already discovered strong evidence showing that the Individual Defendants have breached the restrictive covenants contained in their Employment Agreements (Exs. A, B & C to the Verified Complaint), including the following:

- Thomas and Bennett resigned simultaneously without providing the contractually required notice.
- Gullett is still an employee of WTW SE but has started work at Alliant with Thomas and Bennett.
- Defendants improperly solicited three WTW SE's employees in the Surety Practice to join Alliant.
- Nine long-standing clients of WTW SE, clients who had been serviced at WTW SE by the Individual Defendants, and were thus Restricted Clients under the non-solicitation covenants, moved their surety business from WTW SE to Alliant immediately after the Individual Defendants went to work at Alliant.
- A representative of one of those clients advised WTW SE that the client intended to work with Defendant Thomas at Alliant.
- Within the last week, Bennett and Gullett directly and/or indirectly solicited a current WTW SE client to move its business from WTW SE to Alliant.

8.      Alliant's coordinated raid on WTW SE's Surety Practice is not an accident but is in fact Alliant's *modus operandi* and business plan. Over the past several years, Alliant has raided WTW SE and other insurance brokers from coast-to-coast using the same playbook by having employees disregard their notice provisions and submit their immediate resignation. This has resulted in Alliant and former employees being sued and/or enjoined in lawsuit after lawsuit, including in lawsuits brought by WTW SE, the most recent of which was less than a year ago in this very District and Division, alleging a similar pattern of unlawful conduct (*see Willis Towers Watson Southeast, Inc. v Alliant Insurance Services, Inc.*, et al., 21-cv-417 (W.D.N.C. 2021) (case

3

settled before the court had to rule on the motion for a TRO); *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services, Inc. et al.*, Case No. 202982-1 (Chancery Court for Knox County, Tennessee 2021) (Alliant raided WTW SE's highly specialized, Knoxville, TN-based Health and Benefits Practice, and WTW SE filed suit and moved for a temporary restraining order, and both Alliant and two individuals were enjoined by the court). WTW SE and other insurance brokers have successfully enjoined both former employees and Alliant from carrying out this unlawful conduct.

9.     WTW SE brings this action seeking temporary, preliminary, and permanent injunctive relief to maintain the status quo and to prevent the Individual Defendants from continuing to breach their restrictive covenants by unlawfully soliciting, accepting business from, and providing services to WTW SE clients and prospects and soliciting WTW SE employees. WTW SE also seeks to enjoin Alliant from tortiously interfering with WTW SE's contractual rights and aiding and abetting in the breach of the restrictive covenants.

10.     In the absence of immediate injunctive relief to maintain the status quo, WTW SE will suffer immediate, devastating, and irreparable harm due to the resulting damage to its Surety Practice, caused entirely by the unfair business practices of the Defendants.

## THE PARTIES

11.     Plaintiff WTW SE, successor-in-interest to Willis of North Carolina, Inc., a North Carolina company ("Willis NC"), is a Tennessee corporation with its principal place of business located at 265 Brookview Centre Way, Floor 5, Knoxville, Tennessee 37919.

12.     Defendant Alliant is a California corporation with its principal place of business located at 1301 Dove Street, Suite 200, Newport Beach, California 92660. Alliant is registered to

4

do business in North Carolina with a registered office located at 2 South Salisbury Street, Raleigh, North Carolina 27601.

13.     Defendant Thomas is a resident of Mecklenburg County, North Carolina who lives at 12003 Willoughby Run Drive, Charlotte, NC  28277. On April 10, 2017, at the outset of his employment, Thomas entered into an Employment Agreement with Willis NC ("Thomas Employment Agreement"), a true and correct copy of which is attached as **Exhibit A**.

14.     On June 13, 2022, at which time he was Surety Team Leader of WTW SE's Surety Insurance Practice, Thomas submitted his immediate resignation.. Thomas is now employed by Alliant.

15.     Defendant Bennett is a resident of Mecklenburg County, North Carolina who lives at 4508 Longwood Drive, Charlotte, NC  28209. On May 24, 2018, at the outset of his employment, Bennett entered into an Employment Agreement with Willis NC ("Bennett Employment Agreement"), a true and correct copy of which is attached as **Exhibit B**.

16.     On June 13, 2022, at which time he was a member of WTW SE's Surety Practice, Bennett submitted his immediate resignation. Bennett is now employed by Alliant.

17.     Defendant Gullett is a resident of Alleghany County, North Carolina who lives at 1367 Memorial Park Drive, Sparta, NC 28675. On June 21, 1999, at the outset of her employment, Gullett entered into an Employment Agreement with Willis Corroon Corporation of North Carolina, which changed its name to Willis of North Carolina, Inc. ("Gullett Employment Agreement"), a true and correct copy of which is attached as **Exhibit C**.

18.     Thomas, Bennett and Gullett worked out of WTW SE's office located in Charlotte, NC.

5

29053232v.2

19.     Despite a fifteen (15) day notice provisions in each of the Individual Defendants'
agreements with WTW SE, Thomas and Bennett resigned suddenly and without notice.

20.     Gullett is still an employee in the Surety Practice of WTW SE, but has been working
at Alliant with Thomas and Bennett since on or about June 13, 2022.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the
citizenship of WTW SE is different from the citizenship of all the Individual Defendants and
Alliant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. In
particular, for diversity purposes, WTW SE is a Tennessee corporation with its principal place of
business in Tennessee, the Individual Defendants are North Carolina citizens, and Alliant is a
California corporation with its principal place of business in California.

22.     The Court has supplemental jurisdiction over WTW's state law claims pursuant to
28 U.S.C. § 1367.

23.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1397 because
a substantial part of the events or omissions giving rise to WTW SE's claims against the Individual
Defendants and Alliant occurred within this District and Division. Furthermore, a number of the
Individual Defendants reside in this District and Division, and each Individual Defendant has and
continues to transact and conduct business in North Carolina, including the acts giving rise to the
breach of their contractual obligations and tortious conduct set forth herein. Furthermore, each of
the Individual Defendants employment agreements provides that it is to be governed by and
construed in accordance with the laws of North Carolina, the state in which the Individual
Defendants were assigned a regular office location by WTW SE.

6

# FACTUAL ALLEGATIONS

## A.    The Business of Insurance Brokerage

24.    WTW SE is an insurance broker and consulting firm providing a variety of insurance brokerage and related financial services to clients in North Carolina and around the country, including property and casualty, employee benefits, surety, risk management, consulting, and many other services for various industries. Generally speaking, an insurance broker acts as an intermediary on behalf of its clients to broker an insurance program with the insurance market. WTW SE is known as the broker of record for its clients.

25.    While they were employed by WTW SE, the Individual Defendants' duties and responsibilities included, among other things, earning new business and sustaining and servicing existing client relationships. To accomplish these duties, they were provided and gained extensive access to confidential and proprietary information about WTW SE clients and prospective clients, and, with the financial backing of WTW SE, had the opportunity to develop and maintain client-facing business relationships with a large number of important WTW SE clients and prospective clients.

26.    Additionally, the Individual Defendants were senior leaders of WTW SE's Surety Practice and carried the expectation that they develop relationships with all of the clients in their market, thus giving them unique insight to the client base, adding a heightened degree of risk to the business should they leave and move to a competitor. They also had knowledge of the compensation of all the other members of WTW SE's Surety Practice.

27.    The Surety Practice provides core brokerage and consulting services to its clients including, but not limited to, strategic program assessment, comprehensive data analysis, development and execution of targeted action plans, and renewal and placement activities.

7

28.     The Individual Defendants benefited from WTW SE's, its parent company's, and its affiliated entities' (collectively "Willis Towers Watson"), advertising, goodwill, name recognition, promotional marketing, and sales, administrative and other support. To build upon the personal relationships that develop between employees and clients and prospective clients, employees are encouraged to actively entertain clients and prospective clients. The Individual Defendants spent thousands of dollars for business, entertainment, and client development expense in connection with maintaining relationships with WTW SE clients, and for purposes of soliciting prospective clients.

29.     To ensure the success of the Individual Defendants, WTW SE provided the resources necessary to do their jobs and develop and nurture client relationships with existing, new, and prospective clients, including office space, marketing support, expense accounts, computer systems, research, administrative support, and access to the company's proprietary data and intellectual capital, all of which was provided at significant expense to WTW SE and its affiliated companies.

30.     The nature of the insurance brokerage business is such that client and prospective client identities, preferences, risk tolerances, pricing, and other similar information is extremely valuable. Such information, which allows a company such as WTW SE to serve its clients, can be used by competitors to entice a client from WTW SE. This confidential and proprietary information provides WTW SE with an earned competitive advantage in providing insurance brokerage services at competitive pricing to its clients. To that end, WTW SE provides extensive research, information, and training in particular areas of specialty so that its employees can meet the needs of clients to develop optimal risk management solutions.

8

31.     To protect its investments, information, and client relationships from unfair competition and ensure the secrecy of its confidential and proprietary information, WTW SE takes reasonable and prudent measures such as requiring employees like the Individual Defendants to execute a variety of agreements which contain confidentiality provisions, non-solicitation provisions, and other forms of reasonable restrictive covenants that apply during employment and for a reasonable period of time after employment ends, including employment and compensation agreements.  These types of agreements are common in the industry and, indeed, Alliant utilizes very similar agreements.

32.     Given the competitive nature of the insurance brokerage industry, WTW SE and its parent company Willis Towers Watson plc invest a significant amount of time, money, and resources developing and nurturing the client base and identifying the needs and preferences of clients. The information gathered through WTW SE employees has been compiled over many years at significant expense to Willis.

**B.    The Individual Defendants' Roles in the Surety Practice**

33.     WTW SE's Surety Practice is a highly specialized segment of the insurance brokerage industry which, among other things, navigates the complex and unique risk landscape faced by its clients.

34.     On or about April 10, 2017, Thomas was hired by Willis NC and then groomed by WTW SE, serving as Surety Team Leader for Charlotte, NC at the time of his resignation. Thomas' annual base compensation at the time of his resignation was in excess of $519,043. On June 13, 2022, Thomas submitted his immediate resignation and is now employed by Alliant.

35.     On or about Jun 11, 2018, Bennett was hired and then groomed by WTW SE, starting as a Senior Associate and rising as far as Associate Director of the Surety Practice at the

time of his resignation. Bennett's annual base compensation at the time of his resignation was approximately of $200,749. On June 13, 2022, Bennett submitted his immediate resignation and is now employed by Alliant.

36. On or about Jun 21, 1999, Gullett was hired by Willis Corroon Corporation of North Carolina and then groomed by Willis NC and WTW SE, starting as a Surety Account Manager and rising as far as Assistant Vice President of the Surety Practice. Gullett's annual compensation in 2019, before she went out on paid disability leave, was approximately $102,189. On or about June 17, 2022, WTW SE learned that Gullett is now working with Thomas and Bennett at Alliant as an Assistant Vice President of the Surety Practice.

37. The Individual Defendants worked out of WTW SE's office located in Charlotte, NC.

38. Despite a fifteen (15) day notice provisions in Thomas and Bennett's agreements with WTW SE, they each resigned suddenly and without notice. Gullett has not resigned; she remains an employee of WTW SE and has never told WTW SE that she started work at Alliant.

39. The Individual's Defendants' significant compensation during the course of their employment with WTW SE reflects the magnitude of the business they oversaw and for which they were responsible. The Individual Defendants were extensively involved in the soliciting and servicing existing Surety Practice clients and were responsible for selling and marketing WTW SE's insurance-related services to prospective clients. Their responsibilities required them to be intimately familiar with the industry and client preferences. Their responsibilities also required them to maintain and deepen relationships and goodwill with WTW SE clients and to build new business relationships with both existing clients and prospective clients.

10

40.     While employed by WTW SE, the Individual Defendants and the Surety Practice generated millions of dollars in annual revenue.

C.     **Thomas, Bennett and Gullett's Contractual Obligations to WTW SE[1]**

41.     The Individual Defendants' Employment Agreements each contain termination provisions which state in relevant part:

> Term and Termination. This Agreement shall commence upon the effective date first set forth above and shall continue until terminated (i) by either party, with or without cause, **upon fifteen calendar days' prior written notice**, (ii) immediately by employer upon any willful misconduct or material breach by Employee of this Agreement, or (iii) immediately upon the Employee's death or disability (as disability is defined in the Employer's Long Term Disability Benefits Plan).

See Ex. A, at ¶ 4; Ex. B, at ¶ 4; Ex. C, at ¶ 5 (emphasis added).

42.     The Employment Agreements executed by the Individual Defendants contain certain restrictive covenants and other contractual obligations governing their conduct both during and after termination of their employment with WTW SE.

43.     The Employment Agreements provide, in part, that during their employment, the Individual Defendants owed a duty of loyalty to WTW SE:

> Employee Loyalty, Non-competition and Non-solicitation. Employee understands that Employee owes a duty of loyalty to Employer and, while in Employer's employ, shall devote Employee's entire business time and best good faith efforts to the furtherance of Employer's legitimate business interests. All business activity participated in by Employee as an employee of Employer shall be undertaken solely for the benefit of Employer. Employee shall have no right to share in any commission or fee resulting from such business activity other than the compensation referred to in paragraph 1.

See Ex. A, at ¶ 3; Ex. B, at ¶ 3.

> Employee Loyalty, Non-competition and Non-solicitation. Employee agrees to devote Employee's entire business time and best efforts to the furtherance of the business of Employer during the term of this Agreement. All references in this paragraph to

---

[1] The Thomas, Bennett and Gullett Employment Agreements are collectively referred to as the "**Employment Agreements**."

11

"Employer/Willis Corroon" shall be understood to refer to Employer and Employer's parent, sister, and subsidiary companies, as well as their successors and assigns.

See Ex. C, at ¶ 4.

44.    The Employment Agreements continue with restrictive covenants which apply during employment and for twenty-four (24) months thereafter, pursuant to which the Individual Defendants agreed not to:

> a.    directly or indirectly solicit, accept, or perform, other than on Employer's behalf, insurance brokerage, insurance agency, risk management, claims administration, consulting or other business performed by Employer/Willis from or with respect to (i) clients of Employer/Willis with whom Employee had business contact or provided services to, either alone or with others, while employed by either Employer or any affiliate of Employer and, further provided, such clients were client of Employer/Willis either on the date of termination of Employee's employment with Employer or within twelve (12) months prior to such termination (the "Restricted Clients") and (ii) active prospective clients of Employer/Willis with whom Employee had business contacts regarding the business of Employer/Willis within six (6) months prior to termination of Employee's employment with Employer (the "Restricted Prospects").

> b.    directly or indirectly (i) solicit any employee of Employer/Willis ("Protected Employees") to work for Employee or any third party, including any competitor (whether an individual or a competing company) of Employer/Willis or (ii) induce any such employee of Employer/Willis to leave the employ of Employer/Willis.

> For purposes of this paragraph 3, "Territories" shall refer to those counties where the Restricted Clients, Restricted Prospects, or Protected Employees of Employer/Willis are present and available for solicitation.

See Ex. A, at ¶ 3; Ex. B, at ¶ 3.

> a. within the "Territories" described below, directly or indirectly solicit, accept, or perform other than on Employer's behalf, insurance or bond brokerage, agency, risk management, claims administration, self-insurance, consulting or other business performed by the Employer from or with respect to (i) clients of Employer/Willis Corroon with whom Employee had business contact or provided services to (either alone or with others) while employed by Employer and, further provided, such clients were clients of Employer/Willis Corroon as of either the date of termination of Employee's employment with Employer or within twelve

12

(12) months prior to such termination (referred to below as the "restricted clients") and (ii) active prospective clients of Employer/Willis Corroon with whom Employee had substantial business contacts regarding the business of the Employer within six (6) months prior to termination of Employee's employment with Employer (referred to below as the "restricted active prospective clients");

      b.    directly or indirectly solicit any of Employer's employees or any of the employees of Employer's parent, sister or subsidiary companies to work for Employee or any competitor (whether an individual or a competing company) of Employer.

For purposes of this paragraph 4, "Territories" shall refer to those counties where the restricted clients or restricted active prospective clients of Employer/Willis Corroon are present and available for solicitation and servicing.

See Ex. C, at ¶ 4.

45.    In addition to other remedies that might be available for a breach of the contractual obligations contained in the Agreements, the Employment Agreements contain an acknowledgement that in the event of a breach of the restrictive covenant, WTW SE would be entitled to enjoin the Individual Defendants' unlawful conduct through an injunction.

46.    Each Individual Defendant was assigned a regular office location in North Carolina.

47.    The Employment Agreements provide that the Employment Agreement shall be governed by North Carolina law without giving effect to that state's conflict of law principles. See Ex. A, at ¶ 7; Ex B. at ¶ 7; Ex C. at ¶ 8.

### c. The Raid on WTW SE's Charlotte Office

48.    On or about June 13, 2022, Alliant's scheme to raid WTW SE's Surety Practice based in Charlotte, North Carolina came to fruition when Thomas and Bennett resigned simultaneously, with immediate effect, despite the fact that their Employment Agreements require that they provide fifteen (15) days' notice, and both went to work for Alliant.

49.    On June 14, 2022, Alliant solicited three WTW SE employees to leave their employment with WTW SE and join Alliant.

13

50.     On or about June 17, 2022, WTW SE learned that Gullett is now working with Thomas and Bennett at Alliant as an Assistant Vice President of the Surety Practice, and she may have started work at Alliant on or about June 13, 2022 or earlier.

51.     On June 14, 2022, Besco Electric Corporation, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a broker of record (BOR) letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit D**.

52.     Once a BOR has been secured by a competitor, it is very difficult, if not impossible, for WTW SE to convince a client to return.

53.     On June 14, 2022, Joyce & Associates Construction, Inc., a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit E**.

54.     On June 14, 2022, Hall Contracting Corporation, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit F.**

55.     On June 14, 2022, Buckeye Bridge, LLC, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit G.**

56.     On June 15, 2022, Smith-Rowe, LLC, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it

14

was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit H.**

57.     On June 15, 2022, Propst Construction Company, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached as **Exhibit I.**

58.     On June 17, 2022, Kirkland, Inc., a long-time WTW SE client serviced by Thomas, Bennett and Gullett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached to the Verified Complaint as **Exhibit J.**

59.     On June 17, 2022, Weaver Cook Construction, LLC, a long-time WTW SE client serviced by Thomas, Bennett and Gullett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached to the Verified Complaint as **Exhibit K.**

60.     On June 17, 2022, Rush Masonry Management LLC, a long-time WTW SE client serviced by Thomas, Bennett and Gullett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective immediately. A true and correct copy of the BOR letter is attached to the Verified Complaint as **Exhibit L.**

61.     Yesterday, June 20, 2022, David Jackson, President of Interstate Roofing, a current P&C and Surety Practice client of WTW SE, advised that the "new boss" at Alliant for Bennet, who worked on the Interstate Roofing account while he was at WTW SE, called him last

15

week. Mr. Jackson implied that the call was to solicit Interstate Roofing to move its business from WTW SE to Alliant. Mr. Jackson further advised that Gullett, who worked with Interstate Roofing in the past for WTW SE, called him yesterday, June 20, 2022, and Mr. Jackson implied that her call was also to solicit Interstate Roofing to move its business from WTW SE to Alliant. See June 21, 2022 Declaration of Tom Cox, a true and correct copy of which is attached to the Verified Complaint as **Exhibit M.**

62.     On June 13, 2022, Willis North America's Senior Vice-President & Associate General Counsel, Matt Mulroy, reminded Thomas and Bennett via letter of their contractual obligations to WTW SE under their Employment Agreements. See June 13, 2022 letters, a true and correct copy of which is attached to the Verified Complaint as **Exhibits N** and **O.**

63.     On June 15, 2022, counsel for Alliant, Thomas and Bennett responded and advised that Thomas and Bennett were "mindful" of the post-employment covenants contained in their Employment Agreements. See June 15, 2022 letters, a true and correct copy of which is attached to the Verified Complaint as **Exhibits P** and **Q.**

### d.     Alliant's History of Unfair Business Practices

64.     Based upon Alliant's history of raiding competitors' offices, and the allegations set forth above, Alliant's intention is to unfairly compete by harming WTW SE's Surety Practice in Charlotte, despite WTW SE's employees being bound by enforceable restrictive covenants.

65.     This scheme is in keeping with Alliant's growth strategy of targeting producers with books of business and teams from competitors, resulting in a string of lawsuits against Alliant for such corporate raids.[2] In fact, approximately one year ago, Alliant raided WTW SE's highly

---

[2] See e.g., *Corporate Synergies Group, LLC v. Andrews*, 2:18-cv-13381 (D.N.J. 2018); *Wells Fargo Ins. Servs. v. Alliant Ins. Servs.*, 2017-0540-JTL (Del. Ch. 2017), *Hays Group, Inc. v. Peters*, 0:16-cv-02352 (D. Minn. 2016); *Aon PLC v. Heffernan*, 1:16-cv-1924 (N.D. Ill. 2016);

specialized, Charlotte-based Public Entity and Education Practice, and WTW SE filed suit in this District and Division and moved for a temporary restraining order (see Willis Towers Watson Southeast, Inc. v Alliant Insurance Services, Inc., et al., 21-cv-417 (WDNC 2021)). That case settled before the court had to rule on the motion for a TRO.

66. Several weeks prior to that, Alliant raided WTW SE's highly specialized, Knoxville, TN-based Health and Benefits Practice, and WTW SE filed suit and moved for a temporary restraining order, and both Alliant and two individuals were enjoined by the Chancery Court for Knox County, Tennessee, *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services, Inc. et al.*, Case No. 202982-1.

67. By way of another example, on August 7, 2020, Alliant and four of its newest producers were sued by Arthur J. Gallagher & Co. in the United States District Court for the Northern District of California after a mass resignation of employees, followed by more than 50 clients leaving Gallagher within days. *Arthur J. Gallagher & Co. v. Tarantino, et al.*, Case No. 3:20-cv-05505-JCS (N.D. Cal. 2020). The complaint in that case alleges facts that are remarkably similar to those alleged here and in the two other cases brought by WTW SE against Alliant:

> For at least nine months, Alliant, a direct competitor of Gallagher in the competitive insurance brokerage market, has conspired with key Gallagher executives in the Bay Area, *while they were still employed by Gallagher,* to raid Gallagher's Northern California operations, steal confidential information and trade secrets, and target key performers to improperly gain access to protected client and employee information and use it to take millions of dollars in business.
>
> In a mass resignation coordinated by Alliant and Individual Defendants, more than 10 employees left Gallagher over a span of five days without providing any notice or transition period and immediately began working for Alliant. This coordinated attack on Gallagher was planned over several months. The attack included the

---

*Regions Ins. Inc. v. Alliant Ins. Servs.*, 3:13-cv-00667 (S.D. Miss. 2013); *Cook Maran & Assocs., Inc., v. Scrocca*, No. C-209-17 (N.J. Sup. Ct. 2017); *Wells Fargo Ins. Servs. v. Alliant Ins. Servs.*, 2017-0540-JTL (Del Ch. 2017); *Aon Risk Servs., N.E. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. December 20, 2011).

stealing of key customer data, active solicitation of Gallagher customers in the weeks leading up to the employees' departures (including golf outings during the COVID-19 quarantine period charged to Gallagher less than a month prior to the resignations), and efforts to sabotage Gallagher's ability to keep its customers. As part of this coordinated attack, nearly fifty (50) customers left Gallagher within a few days of the mass resignation. In a span of weeks, Alliant successfully poached 15 employees from Gallagher, and, with the assistance of the Individual Defendants, is continuing to target additional key Gallagher employees, using confidential information on relationships, salary and benefits to do so.

*     *     *

Alliant's conduct is consistent with its national strategy of stealing business unlawfully from competitors, which often results in the imposition of injunctions and other negative rulings against it. Indeed, Alliant touts a growth strategy of "leveraged" hires—in reality, raids—of high-end producers from competing firms with the goal of stealing existing books of business and the employees who service those accounts. . . .

68.     In a case filed in Delaware Chancery Court in 2019, *Mountain West Series of Lockton Companies, LLC et al. v. Alliant Insurance Services, Inc.*, Case No. 2019-0226-JTL (Del. Ch. Ct. 2019), Alliant was alleged to have tortiously interfered with Lockton's relationships with its clients and employees in Colorado by inducing many of the highest grossing producers to breach the terms of their agreements and their fiduciary duties, resulting in the mass departure of 26 employees and 24 clients worth several millions of dollars in annual revenue within just six days. In granting Lockton's motion for preliminary injunction, the Delaware Chancery Court described the plan, similar to what has occurred here:

Immediately after resigning, every one of the Former Employees joined defendant Alliant Insurance Services, Inc., a Delaware corporation that competes with Lockton. None of the Former Employees gave prior notice to Lockton before resigning. Once at Alliant, the Former Employees engaged in a full-court press to solicit the customers that they had supported and serviced while at Lockton. The Former Employees also helped Alliant solicit additional Lockton personnel.

Alliant encouraged and facilitated the efforts of its new hires to solicit their Lockton customers. Indeed, having the Former Employees solicit their Lockton customers was the reason that Alliant engineered their mass resignations. Beginning in September 2018, Alliant spent months recruiting and then working closely with the Producer Members to plan and coordinate their departures. By December, Alliant

18

had learned about and analyzed the restrictive covenants in the Producer Members' agreements. But rather than respecting those covenants, Alliant induced the Producer Members to leave Lockton and breach them. Alliant also expanded its recruiting efforts to the insurance professionals who supported the Producer Members. In some cases, there is evidence that the Producer Members assisted Alliant before leaving their employment with Lockton by soliciting Lockton customers and their fellow Lockton employees.

69.     Among other things, the preliminary injunction that was entered enjoined Alliant from: (i) soliciting any of Lockton's clients; (ii) providing insurance brokerage services to any of the clients covered by the employees' restrictive covenants, including those clients that had already left Alliant; and (iii) soliciting and hiring any other Lockton employees. This is similar to the relief that WTW SE is requesting here.

70.     As detailed above, WTW SE expended considerable time, effort, and resources developing and marketing its products and services and cultivating its relationships with its members, employees, and consultants, as well as its clients and prospective clients.

71.     The Individual Defendants each had access to valuable confidential and proprietary information that belonged exclusively to WTW SE and Willis Towers Watson.

72.     The Individual Defendants are bound by enforceable restrictive covenants that prohibit the solicitation, acceptance of business from and providing services to Restricted Clients and Restricted Prospects. The covenants also prohibit the solicitation of employees.

73.     These restrictive covenants do not prohibit the Individual Defendants from working for competitors like Alliant. Rather, they are narrowly tailored to protect WTW SE's legitimate business interests and only prevent the Individual Defendants from soliciting, accepting business from, or servicing those Restricted Clients and Restricted Prospects with whom they had material business contact for a reasonable time period prior to the termination of their employment.

19

74.     Further, WTW SE's two-year covenants are reasonably necessary to permit WTW SE to rebuild and reestablish client servicing teams in the places of those now former employees, which involves new hiring and/or retraining of existing personnel, and which takes years to properly accomplish. This practice was built over the course of decades and has been damaged in a matter of days. A two-year restriction is necessary for WTW SE to fairly compete, rebuild, and reestablish client relationships without interference after the loss of its employees servicing its client accounts in the highly specialized Surety Practice.

75.     Consistent with industry practice, both WTW SE and Alliant require employees to enter into employment agreements that contain restrictive covenant obligations. These provisions are designed to ensure an orderly transition before and after the employee departs, thereby protecting the employer's client relationships.

76.     The Defendants, acting in concert with each other, have chosen to deliberately and intentionally ignore these contractual obligations.

77.     As a result of the raid by Alliant, WTW SE has lost three senior leaders and producers, along with nine Surety Practice clients.

78.     WTW SE seeks to enjoin Alliant and the Individual Defendants from further interference with its client relationships and employees. WTW SE also seeks to recover damages that it has suffered as a result of the Defendants' unlawful conduct, including, but not limited to, disgorgement of monies earned by the Individual Defendants while they were breaching their duties of loyalty, compensatory damages, punitive damages, and attorney's fees and costs.

79.     However, monetary damages are not enough. If Defendants are permitted to continue soliciting, accepting business from and/or providing services to Restricted Clients and

Restricted Prospects as prohibited by the restrictive covenants, WTW SE will be irreparably harmed.

80.     Unless the Individual Defendants are enjoined from violating their restrictive covenant obligations for their contractually agreed upon two-year period, WTW SE will be deprived of the critical transition period during which it is assured of continuing to provide services to its clients without interruption by the Individual Defendants, all of whom have already begun working for a direct competitor. This would cause irreparable damage to WTW SE's relationships with its clients and even possibly cause it to lose its client relationships.

81.     In the absence of a temporary restraining order, followed by a preliminary and permanent injunction, the damage to WTW SE's business and the loss of client goodwill, which WTW SE has built through the expenditure of substantial effort and expense as detailed above, would be incalculable. WTW SE stands to not only lose clients to a competitor, but also lose the referrals from existing clients, which could have drastic and irreparable consequences for WTW SE's operations in Charlotte.

82.     These unlawful acts will also result in the tarnishing of WTW SE's longstanding image of dependability, stability, and client service dating back decades in Charlotte, along with the loss of client confidence, the loss of talent to a competitor, and the loss of office stability and morale.

83.     The continuing threat of irreparable harm can only be remedied by issuance of injunctive relief to protect WTW SE's legitimate business interests.

84.     There is no adequate remedy at law to compensate WTW SE for the harm that it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

29053232v.2

85.     An injunction requiring the Defendants to honor the terms of the Individual Defendants' Agreements serves to maintain the status quo by preventing further breach.

86.     Should the Individual Defendants further breach their restrictive covenants, WTW SE will suffer additional harm that is incapable of being measured solely in terms of monetary damages, as it will be impossible to calculate the injurious effects of the Defendants' conduct upon WTW SE's future lost profits.

87.     Should the Court refuse to enforce the narrowly tailored restrictive covenant obligations designed to protect WTW SE's legitimate interests, it will send a message to competitors that they can induce employees to disregard common law and contractually agreed obligations with impunity. It will also send a message to similarly situated employees that they can receive consideration in exchange for covenants and obligations under North Carolina law, be supported in their business development efforts on behalf of their employer to develop relationships with clients and prospects, yet leave suddenly and disregard their contractual obligations by soliciting clients, prospects and employees. As a result, the investments undertaken by WTW SE to gain a competitive edge in a highly competitive business will be lost forever.

**CLAIMS FOR RELIEF**

**COUNT I**
**Injunctive Relief**
**(Against All Defendants)**

88.     WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

89.     By evidencing that the Individual Defendants indirectly solicited WTW SE's employees on behalf of Alliant in violation of their contractual duties of loyalty, and other

22

contractual agreements, WTW SE has demonstrated a likelihood of success on the merits as to its claims against the Individual Defendants.

90.     By evidencing that the Individual Defendants solicited, accepted business from and/or is serviced former WTW SE's clients on behalf of Alliant in violation of their contractual agreements, WTW SE has demonstrated a likelihood of success on the merits as to its claims against the Individual Defendants.

91.     By evidencing that Alliant tortiously interfered with WTW SE's contractual agreements with the Individual Defendants, without justification or privilege by inducing them to breach their contractual duties of loyalty and contractual agreements by soliciting employees and Restricted Clients, WTW SE has demonstrated a likelihood of success on the merits as to its claims against Alliant.

92.     The Individual Defendants acknowledged in their respective Agreements that WTW SE would suffer irreparable harm and/or that monetary damages would not be an adequate remedy if they were to breach the restrictive covenants contained therein.

93.     As a result of Defendants' conduct, WTW SE has suffered and will continue to suffer immediate and irreparable harm unless Defendants' conduct is enjoined by this Court.

94.     The Individual Defendants also acknowledged that in the event of a breach of the restrictive covenants, WTW SE would be entitled to the issuance of temporary and permanent injunctive relief.

95.     Public policy and the balancing of the equities favors the issuance of a temporary injunctive relief, followed by permanent injunctions against the Defendants.

23

96.     As a consequence of the foregoing, WTW SE respectfully requests that this Court issue a Temporary Restraining Order against the Individual Defendants, and thereafter, a Preliminary Injunction and then Permanent Injunction, that enjoins and restrains:

      (i)     Defendants from directly or indirectly disclosing, in whole or in part, any and all of WTW SE or Willis Towers Watson company's non-public confidential and/or proprietary information and trade secrets owned or possessed by WTW SE and its and their parent companies and affiliates, including, but not limited to, information regarding any aspect of its or their business, strategic planning, financial information, clients, prospective clients, and employees to which the Individual Defendants had access to or which was provided to them by employees of WTW SE during the course and scope of their employment with WTW SE without the consent of WTW SE;

      (ii)    The Individual Defendants for 24 months following the termination of their employment with WTW SE from directly or indirectly soliciting, accepting business from, or performing insurance brokerage, insurance agency, risk management, claims administration, consulting, or other business performed by WTW SE for Restricted Clients and Restricted Prospects as defined in the Employment Agreement or Non-Solicitation Agreements, and directly or indirectly soliciting any employee of WTW SE or its affiliates to work for Alliant or any other third party, including a competitor of WTW SE or its affiliates or inducing any such employee of WTW SE or its affiliates to leave the employ of WTW SE or its affiliates; and

      (iii)   Alliant be required to divest itself of the client who has already tendered a BOR or any other clients or former clients of WTW SE which became clients of Alliant through the direct indirect actions of Individual Defendants Thomas and Bennett.

97.     WTW SE respectfully requests that this Court also retain jurisdiction over the Parties and subject matter to enforce the terms and conditions of this Order, together with such other and further relief as this Court deems just and equitable under the circumstances.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., is entitled to temporary, preliminary and permanent injunctive relief prohibiting further breaches of and tortious interference with the Individual Defendants respective Employment Agreements and Non-Solicitation Agreement as follows:

i. That a Temporary Restraining Order be issued to restrain and prohibit Individual Defendants until further order of this Court from directly or indirectly (i) soliciting,

24

accepting business from, or providing services to the "Restricted Clients" and "Restricted Prospects" as those terms are defined in the Individual Defendants' Employment Agreements attached to the Verified Complaint as Exs. A, B and C, to the extent Alliant began servicing "Restricted Clients" and "Restricted Prospects," on or about June 13, 2022, Alliant must divest itself from any further servicing of such business, (ii) aiding abetting, encouraging, or permitting the Individual Defendants to solicit any employee of WTW SE or Willis Towers Watson company to work for Alliant or any third party, including any competitor (whether an individual or a competing company) of WTW SE or induce any such employee of WTW SE or Willis Towers Watson company to leave the employ of WTW SE or Willis Towers Watson; and (iii) using or disclosing, in whole or in part, any and all of WTW SE or Willis Towers Watson company's non-public confidential and/or proprietary information and trade secrets owned or possessed by WTW SE and its and their parent companies and affiliates, including, but not limited to, information regarding any aspect of its or their business, strategic planning, financial information, clients, prospective clients, and employees to which the Individual Defendants had access or which was provided to them by employees of WTW SE during the course and scope of their employment with WTW SE ("Confidential Information") without the consent of WTW SE;

ii. That the Individual Defendants be ordered to disgorge any compensation that they received from WTW SE during any period when they were breaching their duties of loyalty;

iii. That following a hearing on the merits, preliminary and permanent injunctive relief be granted;

25

iv. That the Court retain continuing jurisdiction over the parties and subject matter to enforce the terms and conditions of this Order; and

v. That this Court retain jurisdiction to order such other and further relief as this Court deems just and proper.

## COUNT TWO
### Breach of Contract – Non-Solicitation of Restricted Clients
### (Against Individual Defendants)

98.     WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

99.     WTW SE and the Individual Defendants entered into valid and binding Employment Agreements for good and valuable consideration.

100.    The Employment Agreements prohibit the Individual Defendants from directly or indirectly soliciting, accepting business from, and/or providing services to Restricted Clients during their employment and for two years thereafter.

101.    On information and belief, and as evidenced above, the Individual Defendants have solicited, accepted business from and/or are servicing Restrictive Clients at Alliant, and those Restricted Clients include: Besco Electric Corporation, Joyce & Associates Construction, Inc., Hall Contracting Corporation, Buckeye Bridge, LLC, Smith-Rowe, LLC, Propst Construction Company, Kirkland, Inc., Weaver Cook Construction, LLC, and Rush Masonry Management LLC.

102.    On June 20, 2022, David Jackson, President of Interstate Roofing, a current P&C and Surety Practice client of WTW SE, advised that the "new boss" at Alliant for Bennet, who worked on the Interstate Roofing account while he was at WTW SE, called him last week. Mr. Jackson implied that the call was to solicit Interstate Roofing to move its business from WTW SE

26

to Alliant. Mr. Jackson further advised that Gullett, who worked with Interstate Roofing in the past for WTW SE, called him yesterday, June 20, 2022, and Mr. Jackson implied that her call was also to solicit Interstate Roofing to move its business from WTW SE to Alliant.

103.    By soliciting these Restricted Clients to transfer their business to Alliant, and/or accepting and/or servicing their business at Alliant, the Individual Defendants breached the unambiguous and reasonable provisions of Paragraphs 3 and 4 of their respective Employment Agreements.

104.    The Individual Defendants' breaches of their respective Agreements is material.

105.    As set forth above, the non-solicitation provisions in the Employment Agreements are reasonable in time and scope, and necessary to protect WTW SE's legitimate business interests, including its need to protect its goodwill, reputation, and time-invested business relationships with its clients, prospective clients, and employees.

106.    These restrictive covenants are narrowly tailored to WTW SE's legitimate business interests, and are not pure non-competition provisions, but instead, only prevent employees from soliciting, accepting business from, or servicing those Restricted Clients with whom they had business contact with or provided services to pursuant to the Employment Agreements.

107.    Further, WTW SE's two-year covenants are reasonably necessary to permit WTW SE to rebuild and reestablish client servicing teams in the places of those now former employees, which involves new hiring of new personnel and/or retraining of existing personnel, and which takes years to properly accomplish. One year or 18 month restrictions are not enough time to fairly compete, rebuild, and reestablish client relationships without interference after the loss of its employees servicing its client accounts in the high specialized Surety Practice.

108. Because the Individual Defendants solicited Restricted Clients in direct breach of the Agreements, WTW SE has suffered and will continue to suffer irreparable harm and monetary damages. Accordingly, WTW SE is entitled to injunctive relief and monetary damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., is entitled to temporary, preliminary and permanent injunctive relief prohibiting further breaches of the Employment Agreement and further demands judgment against the Individual Defendants for monetary damages in an amount to be proven at trial that exceeds $75,000.00, interest, costs of this action, attorney's fees, and for all further relief this Court deems just and proper.

## COUNT THREE
### Breach of Contract – Non-Solicitation of WTW SE Employees
### (Against Individual Defendants)

109. WTW SE repeats and realleges the allegations each of the above paragraphs as if fully set forth herein.

110. WTW SE and the Individual Defendants entered into valid and binding Employment Agreements for good and valuable consideration.

111. The Employment Agreements prohibit the Individual Defendants from directly or indirectly soliciting employees to leave and work for a competitor during their employment and for two years thereafter.

112. Upon information and belief, the Individual Defendants indirectly solicited three WTW SE employees on June 14, 2022 to leave WTW SE and join them at work for Alliant.

113. By soliciting WTW SE employees to work for Alliant, the Individual Defendants breached the unambiguous and reasonable provisions of their respective Employment Agreements.

28

114.     The Individual Defendants' breaches of their respective Employments Agreement are material.

115.     Because the Individual Defendants solicited WTW SE employees to work for Alliant in direct breach of their respective Employment Agreements, WTW SE has suffered and will continue to suffer irreparable harm and monetary damages. Accordingly, WTW is entitled to injunctive relief and monetary damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., is entitled to temporary, preliminary and permanent injunctive relief prohibiting further breaches of the Employment Agreement and further demands judgment against the Individual Defendants for monetary damages in an amount to be proven at trial that exceeds $75,000.00, interest, costs of this action, attorney's fees, and for all further relief this Court deems just and proper.

## COUNT FOUR
### Breach of Contract – Duty of Loyalty
### (Against Individual Defendants)

116.     WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

117.     WTW SE and the Individual Defendants entered into valid and binding Employment Agreements and WTW SE for good and valuable consideration.

118.     At all times during their employment with WTW SE, the Individual Defendants owed a contractual duty of loyalty to WTW SE pursuant to their Employment Agreements.

119.     Upon information and belief, while employed by WTW SE, each of the Individual Defendants breached their duties of loyalty by, among other things, secretly soliciting each other to resign simultaneously and becoming employed by Alliant, and by secretly soliciting Restricted Clients to leave WTW SE and move their business to Alliant.

29

120. On or about June 17, 2022, WTW SE learned that Gullett, still a current employee of WTW SE, has been working with Thomas and Bennett at Alliant as an Assistant Vice President of the Surety Practice since on or about June 13, 2022 or earlier.

121. On June 20, 2022, David Jackson, President of Interstate Roofing, a current P&C and Surety Practice client of WTW SE, advised that the "new boss" at Alliant for Bennet, who worked on the Interstate Roofing account while he was at WTW SE, called him last week. Mr. Jackson implied that the call was to solicit Interstate Roofing to move its business from WTW SE to Alliant. Mr. Jackson further advised that Gullett, who worked with Interstate Roofing in the past for WTW SE, called him yesterday, June 20, 2022, and Mr. Jackson implied that her call was also to solicit Interstate Roofing to move its business from WTW SE to Alliant.

122. As a direct and proximate result of the unlawful conduct by the Individual Defendants, including their breaches of their Employment Agreement, WTW SE has suffered significant harm based upon the loss of WTW SE employees, the loss of long-standing relationships, revenue and goodwill with six clients that moved their insurance brokerage business to Alliant within days after the Individual Defendants left WTW SE to join Alliant.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., demands judgment against the Individual Defendants for monetary damages in an amount to be proven at trial that exceeds $75,000.00, interest, costs of this action, and for all further relief this Court deems just and proper.

30

## COUNT FIVE
## <u>Tortious Interference with Contract</u>
## (Against All Defendants)

123. WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

124. WTW SE and the Individual Defendants entered into valid and binding Employment Agreements for good and valuable consideration

125. Alliant and the Individual Defendants knew that the Individual Defendants had entered into their respective agreements with WTW SE and were bound by many of its terms both during and after the Individual Defendants' employment.

126. Upon information and belief, Alliant, for its own benefit, intentionally, maliciously, and without any privilege to do so, induced the Individual Defendants to breach their contractual obligations to WTW SE, including but not limited to, breach of the notice periods, the contractual duty of loyalty, and the contractual non-solicitation provisions of their respective Employment Agreements as set forth herein.

127. Upon information and belief, the Individual Defendants, for their own benefit, intentionally, maliciously, and without any privilege to do so, induced one another to breach their contractual obligations to WTW SE, including but not limited to, breach of the notice periods, the contractual duty of loyalty, and the contractual non-solicitation provisions of their respective Employment Agreements.

128. Defendants' actions were without justification.

129. Defendants' interference was conducted through improper means, including without limitation, upon information and belief, offering to pay the legal expenses of the departing WTW SE employees.

31

130.    As a direct and proximate result of Defendants' conduct, WTW SE has suffered and will continue to suffer economic damages.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., demands judgment against Defendants for monetary damages in an amount to be proven at trial that exceeds $75,000.00, interest, costs of this action, attorney's fees, and for all further relief this Court deems just and proper.

## COUNT SIX
### Tortious Interference with Prospective Economic Advantage
### (Against All Defendants)

131.    WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

132.    WTW SE had a bona fide and legitimate expectation of continuing to provide insurance brokerage services to its longtime Surety Practice clients.

133.    But for Defendants' conduct, WTW SE would have entered into future contracts to continue to provide services to its existing Surety Practice clients.

134.    Defendants knew that WTW SE had longstanding relationships with these clients and would have continued to do business with them but for any wrongful interference.

135.    Upon information and belief, the Defendants, for their own benefit, intentionally, maliciously, and without any privilege to do so, induced WTW SE's clients to stop doing business with WTW SE.

136.    Defendants acted without justification.

137.    Defendants' interference was conducted through improper means, including without limitation, upon information and belief, offering to pay the legal expenses of the departing WTW SE employees.

32

138.    As a direct and proximate result of Defendants' conduct, WTW SE has suffered and will continue to suffer economic damages.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., demands judgment against Defendants for monetary damages in an amount to be proven at trial that exceeds $75,000.00, interest, costs of this action, attorney's fees, and for all further relief this Court deems just and proper.

**COUNT SEVEN**
**Civil Conspiracy**
**(Against All Defendants)**

139.    WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

140.    Alliant and the Individual Defendants agreed to engage in unlawful activity, including but not limited to:

    a.  Breaching the Individual Defendants' contracts with WTW SE;

    b.  Tortiously interfering with the Individual Defendants' contracts with WTW SE;

    c.  Tortiously interfering with WTW SE's prospective contracts with its Surety clients; and

    d.  Violating the North Carolina Unfair and Deceptive Trade Practices Act.

141.    Alliant's and the Individual Defendants' conduct proximately caused WTW SE to suffer injury. WTW SE's injury was a result of Alliant and WTW SE acting pursuant to a common scheme to raid and destroy WTW SE's Surety Practice through, among other things, causing multiple resignations and violating restrictive covenants.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., demands judgment against Defendants for monetary damages in an amount to be proven at trial that exceeds

33

$75,000.00, interest, costs of this action, attorney's fees, and for all further relief this Court deems just and proper.

## COUNT EIGHT
### Unfair and Deceptive Trade Practices
### N.C. GEN. STAT. § 75-1.1, *et seq.* ("UDTPA")
### (Against All Defendants)

142.     WTW SE repeats and realleges the allegations in each of the above paragraphs as if fully set forth herein.

143.     Defendants, individually and collectively, committed unfair acts and unfair methods of competition by, among other things, tortiously interfering with the Individual Defendants' Employment Agreements, coordinating targeted solicitations of WTW SE's existing clients and prospective clients as well as soliciting other WTW SE employees, all of which was unlawful, immoral, unethical, and in violation of the ethos of the marketplace.

144.     Upon information and belief, and consistent with Alliant's proven *modus operandi*, Alliant has agreed to indemnify each of the Individual Defendants for any and all breaches of their respective agreements with WTW SE.

145.     Defendants' actions affect commerce, including, but not limited to, the national insurance brokerage market.

146.     Pursuant to N.C. Gen. Stat. § 75-1.1, Defendants' conduct exceeds the bounds of fair and ethical competition, and therefore constitutes an unfair method of competition in or affecting commerce and is an unfair and deceptive act or practice in and affecting commerce.

147.     Defendants unfair acts and unfair methods of competition described herein proximately caused WTW SE's damages, the full extent of which will be determined at trial.

WHEREFORE, Plaintiff, Willis Towers Watson Southeast, Inc., demands judgment against Defendants for monetary damages including, lost profits caused by Defendants' actions in

violation of N.C. Gen. Stat. § 75-1.1, et seq., to have such damages trebled, interest, costs of this action, attorneys' fees, and for all further relief this Court deems just and proper

## DEMAND FOR JURY TRIAL

WTW SE demands a trial by jury on the claims and issues that are triable by jury.

DATE: June 21, 2022.

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ Matthew S. DeAntonio*
Christopher C. Lam (N.C. Bar No. 28627)
clam@bradley.com
Matthew S. DeAntonio (N.C. Bar No. 39625)
mdeantonio@bradley.com
214 North Tryon Street, Suite 3700
Charlotte, NC 28202
Telephone: (704) 338-6000
Fax: (704) 332-8858

**WHITE AND WILLIAMS LLP**

Scott H. Casher (Motion for Pro Hac Vice admission to be filed)
cashers@whiteandwilliams.com
Sabina Corrado (Motion for Pro Hac Vice admission to be filed)
corrados@whiteandwilliams.com
7 Times Square, Suite 2900
New York, New York 10036
Telephone: (212) 244-9500
Fax: (212) 244-6200

*Counsel for Plaintiff*

## <u>VERIFICATION OF GOLY JAFARI</u>

Plaintiff, WILLIS TOWERS WATSON SOUTHEAST, INC., through its authorized representative Goly Jafari, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury, that I have reviewed the allegations made in the foregoing Verified Complaint and that such allegations are true and correct to the best of my knowledge, except those matters stated and alleged upon information belief, and as to those matters, I believe them to be true.


Executed on June 21, 2022


*Goly Jafari*
_____
Goly Jafari

1