UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:22-CV-00277-FDW-DCK

| | |
|---|---|
| WILLIS TOWERS WATSON SOUTHEAST, INC, a Tennessee corporation | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| ALLIANT INSURANCE SERVICES, INC., a California corporation, JOHN T. THOMAS, ANDREW BENNETT, and JENNIFER BOYERS GULLETT | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

**PRELIMINARY INJUNCTION ORDER**

THIS MATTER is before the Court on the Motion for a Temporary Restraining Order and Preliminary Injunction filed by Plaintiff, Willis Towers Watson Southeast, Inc. ("WTW SE" or "Plaintiff") ("Motion," Doc. No. 3), which was supported by Plaintiff's Brief in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction (Doc. No. 4). After the Court denied without prejudice that portion of the Motion seeking a Temporary Restraining Order, Plaintiff submitted a Renewed Motion for a Temporary Restraining Order and filed a supporting brief. (Doc. Nos. 16, 17). Defendants John Thomas ("Thomas"), Andrew Bennett ("Bennett") and Jennifer Gullett ("Gullett") (collectively, the "Individual Defendants"), and Defendant Alliant Insurance Services, Inc. ("Alliant") responded in opposition to the Motion (Doc. No. 8), to which Plaintiff replied (Doc. No. 35). All Defendants have been served with process. (Doc. Nos. 28–31).

1

Plaintiff submitted four sworn declarations in support of the Motion. (Doc. Nos. 1-14, 5, 37, 39). Defendants submitted four sworn declarations in opposition to the Motion. (Doc. Nos. 8-1, 8-3, 8-5, 27). The Court has reviewed the Motion, supporting brief, opposition, reply, the pleadings, declarations, exhibits, and applicable law. On June 30, 2022, the Court conducted oral argument on the Motion, at which time the Court issued it oral ruling granting the motion for a preliminary injunction and summarizing the contents and scope of the preliminary injunction. (Doc. No. 41). The Court indicated a more specific written Order would follow.

For the reasons set forth on the Record on June 30, 2022, and for the reasons set forth below, the Court **GRANTS** the Motion for a preliminary injunction as against the Individual Defendants, **DENIES** as moot the Motion for a temporary restraining order, and **DENIES** the Motion for a preliminary injunction as against Alliant.

As of June 30, 2022, at 1 p.m. E.D.T., the Individual Defendants are enjoined from breaching the post-termination obligations of their employment agreements, including their covenants not to directly or indirectly solicit or provide services to certain customers and not to solicit employees of WTW SE, as more specifically set forth in this Order.

*Findings of Fact*

1. The Court finds the following facts based upon the verified complaint, the affidavits and other evidence submitted by the parties in support of and opposition to the motion at bar, and evidence presented at the hearing in this matter. These findings of fact are based on the limited record before the Court during these preliminary injunction proceedings. Accordingly, while these findings of fact form the basis for issuance of this preliminary injunction, the facts in this case may change through the course of litigation, and nothing in this Order is intended to be binding for purposes of ruling on dispositive motions and/or trial.

2. WTW SE is an insurance broker and consulting firm providing a variety of insurance brokerage and related financial services to clients in North Carolina and around the country, including property and casualty, employee benefits, surety, risk management, consulting, and many other services for various industries.[1] Generally speaking, an insurance broker acts as an intermediary on behalf of its clients to broker an insurance program with the insurance market. WTW SE is known as the "broker of record" for its clients.

3. WTW SE and Alliant are competing insurance brokers.

4. WTW SE's Surety Practice is a highly specialized segment of the insurance brokerage industry which, among other things, navigates the complex and unique risk landscape faced by its clients. The Surety Practice provides core brokerage and consulting services to its clients including, but not limited to, strategic program assessment, comprehensive data analysis, development and execution of targeted action plans, and renewal and placement activities.

5. On or about April 10, 2017, Thomas was hired by Willis NC, and he served as a surety team leader. On June 13, 2022, Thomas resigned from WTW SE, without notice, and became employed by Alliant.

6. On or about Jun 11, 2018, Bennett was hired by WTW SE, starting as a Senior Associate and then serving as Associate Director of the Surety Practice. On June 13, 2022, Bennett resigned from WTW SE, without notice, and became employed by Alliant.

7. On or about Jun 21, 1999, Gullett was hired by Willis Corroon Corporation of North Carolina, starting as a Surety Account Manager and then serving as Assistant Vice President of the Surety Practice. For purposes of this Order, the Court finds that Gullet's employment with WTW SE ended on October 29, 2020, when WTW SE sent her a letter stating that "it can no longer

---

[1] WTW SE is the successor-in-interest of Willis of North Carolina, Inc. ("Willis NC").

hold your position at this time." (Doc. No. 8-6). Gullett admits that she became employed by Alliant on June 20, 2022.

8. While they were employed by WTW SE, the Individual Defendants were assigned to WTW SE's office located in Charlotte, North Carolina. The Individual Defendants' duties and responsibilities included, among other things, earning new business and sustaining and servicing existing client relationships. The Individual Defendants were also responsible for selling and marketing WTW SE's insurance-related services to prospective clients. The Individual Defendants' responsibilities required them to be intimately familiar with the industry and client preferences. Their responsibilities also required them to maintain and deepen relationships and goodwill with WTW SE clients and to build new business relationships with both existing clients and prospective clients.

9. To accomplish these duties, WTW SE provided the Individual Defendants with access to confidential and proprietary information about WTW SE clients and prospective clients. WTW SE provided other resources necessary for the Individual Defendants to do their jobs and develop and nurture client relationships with existing, new, and prospective clients, including office space, marketing support, expense accounts, computer systems, research, administrative support, and access to the company's proprietary data and intellectual capital. The Individual Defendants also benefited from WTW SE's, its parent company's, and its affiliated entities' (collectively "Willis Towers Watson") advertising, goodwill, name recognition, promotional marketing, and sales, administrative and other support.

10. WTW SE and its parent company invest a significant amount of time, money, and resources developing and nurturing the client base and identifying the needs and preferences of clients and prospective clients. The nature of the insurance brokerage business is such that client

and prospective client identities, preferences, risk tolerances, pricing, and other similar information is extremely valuable. Such information, which allows a company such as WTW SE to serve its clients, can be used by competitors to entice a client from WTW SE.

11. While employed by WTW SE, the Individual Defendants and the Surety Practice generated millions of dollars in annual revenue.

12. To protect its investments, information, and client relationships from unfair competition and ensure the secrecy of its confidential and proprietary information, WTW SE takes reasonable and prudent measures such as requiring employees like the Individual Defendants to execute a variety of agreements that contain confidentiality provisions, non-solicitation provisions, and other forms of restrictive covenants that apply during employment and for a period of time after employment ends, including employment and compensation agreements. These types of agreements are common in the industry.

13. On April 10, 2017, at the outset of his employment, Thomas entered into an Employment Agreement with Willis NC ("Thomas Employment Agreement"). (Doc. No. 1-2, Exhibit A to the Complaint).

14. On May 24, 2018, at the outset of his employment, Bennett entered into an Employment Agreement with Willis NC ("Bennett Employment Agreement"). (Doc. No. 1-3, Exhibit B to the Complaint).

15. On June 21, 1999, at the outset of her employment, Gullett entered into an Employment Agreement with Willis Corroon Corporation of North Carolina, which changed its name to Willis of North Carolina, Inc. ("Gullett Employment Agreement"). (Doc. No. 1-4, Exhibit C to the Complaint).

5

16. The Thomas, Bennett and Gullett Employment Agreements are collectively referred to as the "Employment Agreements."

17. The Individual Defendants' Employment Agreements each contain termination provisions, which state in relevant part:

> <u>Term and Termination</u>. This Agreement shall commence upon the effective date first set forth above and shall continue until terminated (i) by either party, with or without cause, upon fifteen calendar days' prior written notice, (ii) immediately by employer upon any willful misconduct or material breach by Employee of this Agreement, or (iii) immediately upon the Employee's death or disability (as disability is defined in the Employer's Long Term Disability Benefits Plan).

(Doc. No. 1; Ex. A, at ¶ 4; Ex. B, at ¶ 4; Ex. C, at ¶ 5).

18. The Employment Agreements executed by the Individual Defendants contain certain restrictive covenants and other contractual obligations governing their conduct both during and after termination of their employment with WTW SE.

19. The Employment Agreements provide, in part, that during their employment, the Individual Defendants owed a duty of loyalty to WTW SE:

> <u>Employee Loyalty, Non-competition and Non-solicitation.</u> Employee understands that Employee owes a duty of loyalty to Employer and, while in Employer's employ, shall devote Employee's entire business time and best good faith efforts to the furtherance of Employer's legitimate business interests. All business activity participated in by Employee as an employee of Employer shall be undertaken solely for the benefit of Employer. Employee shall have no right to share in any commission or fee resulting from such business activity other than the compensation referred to in paragraph 1.

(Doc. No. 1, Ex. A, at ¶ 3; Ex. B, at ¶ 3).

> <u>Employee Loyalty, Non-competition and Non-solicitation.</u> Employee agrees to devote Employee's entire business time and best efforts to the furtherance of the business of Employer during the term of this Agreement. All references in this paragraph to "Employer/Willis Corroon" shall be understood to refer to Employer and Employer's parent, sister, and subsidiary companies, as well as their successors and assigns.

(Doc. No. 1, Ex. C, at ¶ 4).

6

20. The Employment Agreements continue with restrictive covenants that apply during employment and for twenty-four (24) months thereafter, pursuant to which the Individual Defendants agreed not to:

> a. directly or indirectly solicit, accept, or perform, other than on Employer's behalf, insurance brokerage, insurance agency, risk management, claims administration, consulting or other business performed by Employer/Willis from or with respect to (i) clients of Employer/Willis with whom Employee had business contact or provided services to, either alone or with others, while employed by either Employer or any affiliate of Employer and, further provided, such clients were client of Employer/Willis either on the date of termination of Employee's employment with Employer or within twelve (12) months prior to such termination (the "Restricted Clients") and (ii) active prospective clients of Employer/Willis with whom Employee had business contacts regarding the business of Employer/Willis within six (6) months prior to termination of Employee's employment with Employer (the "Restricted Prospects").
>
> b. directly or indirectly (i) solicit any employee of Employer/Willis ("Protected Employees") to work for Employee or any third party, including any competitor (whether an individual or a competing company) of Employer/Willis or (ii) induce any such employee of Employer/Willis to leave the employ of Employer/Willis.
>
> For purposes of this paragraph 3, "Territories" shall refer to those counties where the Restricted Clients, Restricted Prospects, or Protected Employees of Employer/Willis are present and available for solicitation.

(Doc. No. 1, Ex. A, at ¶ 3; Ex. B, at ¶ 3).

> a. within the "Territories" described below, directly or indirectly solicit, accept, or perform other than on Employer's behalf, insurance or bond brokerage, agency, risk management, claims administration, self-insurance, consulting or other business performed by the Employer from or with respect to (i) clients of Employer/Willis Corroon with whom Employee had business contact or provided services to (either alone or with others) while employed by Employer and, further provided, such clients were clients of Employer/Willis Corroon as of either the date of termination of Employee's employment with Employer or within twelve (12) months prior to such termination (referred to below as the "restricted clients") and (ii) active prospective clients of Employer/Willis Corroon with whom Employee had substantial business contacts regarding the business of the Employer within six (6) months prior to termination of Employee's employment with Employer (referred to below as the "restricted active prospective clients");

7

> b. directly or indirectly solicit any of Employer's employees or any of the employees of Employer's parent, sister or subsidiary companies to work for Employee or any competitor (whether an individual or a competing company) of Employer.
>
> For purposes of this paragraph 4, "Territories" shall refer to those counties where the restricted clients or restricted active prospective clients of Employer/Willis Corroon are present and available for solicitation and servicing.

(Doc. No. 1, Ex. C, at ¶ 4).

21. In addition to other remedies that might be available for a breach of the contractual obligations contained in the Agreements, the Miscellaneous Clause contained an express acknowledgement that in the event of a breach of the restrictive covenants: 1) monetary damages may not be a sufficient remedy, and 2) WTW SE would be entitled to enjoin the Individual Defendants' unlawful conduct through an injunction.

22. The Employment Agreements provide that the Employment Agreement shall be governed by North Carolina law without giving effect to that state's conflict of law principles.

23. On or about June 13, 2022, the Individual Defendants began soliciting WTW SE Surety Practice employees to join Alliant.

24. Between June 14 and 24, 2022, circumstantial evidence shows the Individual Defendants solicited at least sixteen (16) long-standing clients of WTW SE to move their business to Alliant and the Individual Defendants are now servicing those clients. These clients issued broker of record ("BOR") letters appointing Alliant as their new broker.

25. On June 14, 2022, Besco Electric Corporation, Joyce & Associates Construction, Inc., Hall Contracting Corporation, Buckeye Bridge, LLC, and Team Construction, LLC, all long-time WTW SE clients serviced by Thomas and Bennett during their employment with WTW SE, issued BOR letters advising that they were moving their surety brokerage business to Alliant effective immediately.

26. On June 15, 2022, Smith-Rowe, LLC and Propst Construction Company, also both long-time WTW SE clients serviced by Thomas and Bennett during their employment with WTW SE, issued BOR letters advising that they were moving their surety brokerage business to Alliant effective immediately.

27. On June 17, 2022, Kirkland, Inc., Weaver Cook Construction, LLC, Rush Masonry Management LLC, and C.T. Wilson Construction Co., Inc., all long-time WTW SE clients serviced by Thomas, Bennett and Gullett during their employment with WTW SE, issued BOR letters advising that they were moving their surety brokerage business to Alliant effective immediately.

28. On June 20, 2022, David Jackson, President of Interstate Roofing, a current P&C and Surety Practice client of WTW SE, advised that the "new boss" at Alliant for Bennett, who worked on the Interstate Roofing account while he was at WTW SE, called him last week. Mr. Jackson implied that the call was to solicit Interstate Roofing to move its business from WTW SE to Alliant. Mr. Jackson further advised that Gullett, who worked with Interstate Roofing in the past for WTW SE, called him on June 20, 2022, and Mr. Jackson implied that her call was also to solicit Interstate Roofing to move its business from WTW SE to Alliant.

29. On June 21, 2022, WTW SE brought suit, asserting in its Verified Complaint claims for Injunctive Relief (Count I), Breach of Contract (Counts II-IV), Tortious Interference with Contract (Count V), Tortious Interference with Prospective Economic Advantage Relief (Count VI), Civil Conspiracy (Count VII), and Unfair and Deceptive Trade Practices Relief (Count VIII).

30. On June 21, 2022, D.J. Rose & Son, Inc., a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business to Alliant effective immediately

31. On June 22, 2022, Conmat, Inc., a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective June 22, 2022.

32. On June 22, 2022, Gator Grading & Paving, LLC, a long-time WTW SE client serviced by Thomas, Bennett and Gullett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE to Alliant effective June 22, 2022.

33. On June 23, 2022, Bordeaux Construction Company, Inc., a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business to Alliant effective immediately.

34. On June 24, 2022, Carolina Specialties Const., LLC, a long-time WTW SE client serviced by Thomas and Bennett during their employment with WTW SE, issued a BOR letter advising that it was moving its surety brokerage business from WTW SE effective June 24, 2022.

## *CONCLUSIONS OF LAW*

### I. NOTICE REQUIREMENTS AND STANDARD OF REVIEW

35. A plaintiff moving for a preliminary injunction must serve the defendant with process. 3M Co. v. Christian Investments LLC, 1:11-CV-627, 2011 WL 3678144 (E.D. Va. Aug. 19, 2011). The movant must also give notice of the motion to the opposing party. Fed. R. Civ. P. 65(a)(1). Prior to the June 30, 2022, hearing, each of the Defendants waived service of process pursuant to Fed. R. Civ. P. 4(d). (Doc. Nos. 28–31). Accordingly, WTW SE has served all Defendants with process. It is also uncontested all Defendants sufficient notice to Defendants of the pending motion.

36. During oral argument on the motion seeking a preliminary injunction, counsel for all parties agreed that Plaintiff's Renewed Motion for a Temporary Restraining Order was moot.

37. To obtain a preliminary injunction, Plaintiff must establish four prongs with a clear showing that: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." Mountain Valley Pipeline, LLC. V. W. Pocahontas Props. Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

## II. THE INDIVIDUAL DEFENDANTS

38. In order to establish likelihood of success on the merits on its breach of contract claim against the Individual Defendants, Plaintiff must show: "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." Samost v. Duke Univ., 742 S.E.2d 257, 260 (N.C. Ct. App. 2013). Courts will find restrictive covenants contained in an agreement between the employer and an employee to be valid and enforceable under North Carolina law if it is: "(1) in writing; (2) reasonable as to terms, time, and territory (3) made part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." Triangle Leasing Co., Inc. v. McMahon, 393 S.E.2d 854, 857 (N.C. 1990); United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 380 (N.C. 1988). In order for a restrictive covenant to not be against public policy, it "must be no wider in scope than is necessary" to protect the legitimate business interests of the employer. Med. Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 327 (N.C. Ct. App. 2009).

39. At the inception of employment, each of the Individual Defendants entered into written agreements with WTW SE that contained, among other things, restrictive covenants. The Individual Defendants received valuable consideration upon entering into their respective

11

Agreements in the form of employment, base salary and other financial renumeration, and other benefits. Because the uncontroverted evidence shows the covenants are in writing, made part of the employment contract, and based on valuable consideration, the Court's analysis turns to whether the covenants are reasonable as to terms, time, and territory and whether they are not against public policy.

40. Pursuant to the Agreements, the Individual Defendants agreed that for two years after the end of their employment with WTW SE, they would not: 1) directly or indirectly solicit, accept business from, or provide services to certain clients and prospective clients; and 2) not solicit WTW SE employees. The covenants regarding clients apply to Restricted Clients, defined in the Agreements as those with whom the Individual Defendants had contact or provided services to while employed by WTW SE—so long as those Restricted Clients were clients of WTW SE on the date of the termination of employment or within the past twelve months of termination of employment—and certain Restricted Prospects with whom the Individual Defendants had business contact within the six months prior to termination of employment. The Agreements do not contain blanket "non-competes." The Agreements do not purport to restrict the Individual Defendants' ability to work for any person or entity, including competitors like Alliant. They are instead narrowly tailored to identify certain Restricted Clients and Restricted Prospects in order to protect WTW SE's client relationships and customer goodwill.

41. The client-based limitations in the Individual Defendants' restrictive covenants are both reasonable and clear as to terms, time, and territory. These restrictive covenants are common in the insurance brokerage industry and Alliant uses similar covenants in its employment agreements. North Carolina courts have recognized the reasonableness of such limitations. See A.E.P. Indus. v. McClure, 302 S.E.2d 754, 760-61 (N.C. 1983); Superior Performers, Inc. v.

12

Meaike, No. 1:13CV1149, 2014 WL 1412434 (M.D.N.C. Apr. 11, 2014); Triangle Leasing Co., Inc. v. McMahon, 393 S.E.2d 854, 857-58 (N.C. 1990); see also Kuykendall, 370 S.E.2d at 386; Redlee/SCS, Inc. v. Pieper, 426, 571 S.E.2d 8, 13 (N.C. Ct. App. 2002); Kennedy, 584 S.E.2d at 333-34.

42. Given the competitive nature of the insurance brokerage industry, WTW SE invests a significant amount of time, money, and resources in developing its client base and identifying needs and preferences of its clients. This information gathered by WTW SE through its employees, and at significant expense, provides WTW SE with a competitive advantage in providing insurance brokerage services at competitive prices to its clients.

43. By virtue of their employment with the Surety Practice, the Individual Defendants possess detailed knowledge of individual clients, such as current commission rates and confidential pricing models, provided to the Individual Defendants for development of business goodwill on behalf of WTW SE. Moreover, the Individual Defendants directly engaged with WTW SE's customers, learning their unique needs and preferences. It is the goodwill developed through the confidential information and other resources that WTW SE provides its employees that the non-solicitation clauses are designed to protect. See Reynolds, 955 F. Supp. at 552-53 (citation omitted).

44. Business goodwill is "a valuable asset of the employer" and is established "[w]hen an employee, during the course of his or her employment, develops or improves customer relationships." Id. at 553 n.4 (internal quotation marks omitted) (quoting Kuykendall, 322 N.C. at 652); see also XPO Logistics, Inc. v. Northrop, No. 3:19-CV-00348-FDW-DSC, 2019 WL

13

3543877, at *6 (W.D.N.C. Aug. 2, 2019).[2] North Carolina courts have also enforced restrictive covenants covering prospective clients in nearly identical situations to this. See Wade S. Dunbar Ins. Agency v. Barber, 556 S.E.2d 331, 335 (N.C. Ct. App. 2001). North Carolina courts also recognize an employer's legitimate interest in preventing the solicitation of other employees of the former employer for a reasonable period of time after termination of an employee's employment. See Superior Performers, 2014 WL 1412434, at *12. Accordingly, the restrictive covenants here are not against public policy because they are designed to protect a legitimate business interest of WTW SE.

45. Having concluded a valid and enforceable agreement containing restrictive covenants exist, the Court now turns to whether Plaintiff has sufficiently established the Individual Defendants are violating their restrictive covenants. Under this record, WTW SE met its burden to show the Individual Defendants have breached the covenants contained in their Agreements by engaging in the solicitation of WTW SE clients and employees. The Court finds particularly compelling the circumstantial evidence provided by WTW SE that within days of Thomas' and Bennett's resignation from WTW SE, at least sixteen long-standing clients serviced by the Individual Defendants during their tenure at WTW SE have issued BOR letters appointing Alliant, the Individual Defendants' new employer, as their new broker. This demonstrates the Individual Defendants are not abiding by their respective restrictive covenants to which they individually assented at the outset of their employment with WTW SE. Accordingly, Plaintiff has made as sufficient showing of likelihood of success on the merits of its breach of contract claim.

---

[2] Employers also have a legitimate interest in protecting against indirect solicitation—which occurs where one uses "third-party employees of their new company to solicit former customers of their old company." See GE Betz, Inc. v. Conrad, 752 S.E.2d 634, 644-45 (N.C. Ct. App. 2013).

14

46. Next, the Court concludes that under this record and given the nature of the insurance brokerage industry, WTW SE has made a clear showing that it is likely to suffer irreparable harm if the Individual Defendants are not enjoined. As an initial matter, the Court notes that the Agreements signed by the Individual Defendants explicitly acknowledge and state that "monetary damages may not be an adequate remedy" for a breach of the restrictive covenants.

47. The Individual Defendants' intimate knowledge of the business operations and personal association with WTW SE clients and prospective clients provides the Individual Defendants with the opportunity to subject WTW SE to additional losses of permanent client relationships, which constitute irreparable harm. See Philips Elecs. N.A. Corp. v. Hope, 631 F. Supp. 2d 705, 711 (M.D.N.C. 2009) ("Loss of permanent relationships with customers and loss of proprietary information may constitute irreparable harm." (citations omitted)); QSP, Inc. v. Hair, 566 S.E.2d 851, 854 (N.C. Ct. App. 2002).

48. Additionally, damage to WTW SE's business and the loss of client goodwill, which WTW SE has built through the expenditure of substantial effort and expense, will be incalculable. WTW SE stands not only to lose more clients and employees to a competitor, but also to lose the referrals from existing clients. These unlawful acts will also tarnish WTW SE's image of dependability, stability, client service, the loss of client confidence, loss of talent to a competitor, and the loss of office stability and morale.

49. Moreover, the continued solicitation of WTW SE employees will also cause immeasurable and irrevocable harm to WTW SE, as the training, experience, and knowledge employees possess, for which WTW SE has provided and paid over the course of their employment, is invaluable to WTW SE's ability to remain viable as a business.

15

Case 3:22-cv-00277-FDW-DCK   Document 43   Filed 07/07/22   Page 15 of 20

50. WTW SE routinely provides its employees with extensive research, information, and training in particular areas of specialty so its employees can readily meet the needs of WTW SE's clients. Without enforcement of the contractual protections to which WTW SE and the Individual Defendants agreed, WTW SE will continue to unfairly lose access to the resources it has provided to its Surety Practice employees through Individual Defendants' unlawful solicitation.

51. As discussed above, the harm to WTW SE if the injunction were not granted would be significant and irreparable. See Lockhart v. Home-Grown-Indus. of Ga., Inc., No. 3:07-CV-297, 2007 WL 2688551, at *4 (W.D.N.C. Sept. 10, 2007). WTW SE would lose more client accounts into which it has invested years of goodwill and resources and may also lose more employees in whom it has likewise significantly invested. And, WTW SE would lose unquantifiable economic sums through lost reputation and account revenue for years to come.

52. By contrast, the Individual Defendants would not suffer irreparable harm if the injunction is granted. The Individual Defendants will be required maintain the status quo, abide by existing valid contractual obligations, and cease all unlawful conduct. The injunction will not restrict their ability to continue to be employed by Alliant or any other competitor. The Individual Defendants are still permitted to compete with WTW SE at Alliant and to compete for the patronage of the public at large, without any temporal or geographic restrictions. The only restraint is that the Individual Defendants must refrain from soliciting WTW SE employees and/or soliciting or doing business with WTW SE the "Restricted Clients" and "Restricted Prospects" as defined in Agreements.

53. The harm to WTW SE if an injunction were not granted outweighs any alleged harm to the Individual Defendants. The balance of hardships favors an injunction.

54. Finally, the Court finds that the public interest is served by granting this preliminary injunction. The public interest is served by "ensuring that contracts are enforced" and preventing "unethical business behavior." Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 724 (M.D.N.C. 2009) (citation omitted); see also Lockhart, 2007 WL 2688551, at *6; Great Am. Ins. Co. v. C.G. Tate Constr. Co., 279 S.E.2d 769, 772 (N.C. 1981); Lab'y Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 464 (M.D.N.C. 2015) (citing Kuykendall, 370 S.E.2d at 380). The North Carolina Supreme Court has held that "it is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." United Labs, Inc., 370 S.E.2d at 380. In addition, WTW SE has a legitimate interest in being able to share confidential information with its employees—including client and prospective client identities, preferences, risk tolerances, pricing, and other information—without fearing that it will end up in the hands of a competitor, and the interest in enforcing parties' agreements outweighs the Individual Defendants' desire to solicit business and employees in a manner that contravenes the restrictive covenants. See XPO Logistics, Inc., No. 319CV00348FDWDSC, 2019 WL 3543877, at *9 (citations omitted).

55. Because Plaintiff has established the four prongs for issuance of a preliminary injunction, see Winter, 555 U.S. at 20, and this court will issue a preliminary injunction against the Individual Defendants in Plaintiff's favor. This preliminary injunction will preserve the status quo until this case is adjudicated on a more fulsome and developed record.

### III. ALLIANT

56. WTW SE has failed to carry its substantial burden at this early stage of litigation to make a clear showing of a likelihood of success on its claim against Alliant for tortious interference with contract. The elements of a tortious interference claim are: (1) a valid contract between the

17

Case 3:22-cv-00277-FDW-DCK    Document 43    Filed 07/07/22    Page 17 of 20

plaintiff and a third party, conferring rights on the plaintiff against the third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third party not to perform; (4) the defendant acts without justification; and (5) actual damage to the plaintiff. Eli Rsch., Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 756 (M.D.N.C. 2004) (citing Embree Constr. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992). WTW SE has not presented sufficient evidence—circumstantial or otherwise—to suggest that Alliant "intentionally induced" the Individual Defendants to breach their restrictive covenants.

57. Without a showing of likelihood of success on the merits, WTW SE cannot establish the legal requirements for preliminary injunction against Alliant to issue.

**IT IS THEREFORE ORDERED** that Plaintiff's Renewed Motion for a TRO (Doc. No. 16) is DENIED AS MOOT, and the remaining portion of Plaintiff's Motion for a Preliminary Injunction (Doc. No 3) is DENIED IN PART as to Alliant and GRANTED IN PART as to the Individual Defendants as follows:

1. Until further Order of the Court, the Individual Defendants shall not, in accordance with their respective Employment Agreements, directly or indirectly solicit, accept business from, or perform insurance brokerage, claims administration, consulting, or other business performed by WTW SE for clients with whom they had business contact with or provided services to, either alone or with others, while employed by WTW SE or any of its affiliates and, further provided, such clients were clients of WTW SE or Willis Towers Watson either on the dates of the Defendants' resignations or within twelve (12) months prior to their resignations and active prospective clients of WTW SE or its affiliates with whom they had business contacts regarding the business of WTW SE or its affiliates within six (6) months prior to the dates of their resignations.

2. Until further Order of the Court, the Individual Defendants shall not, in accordance with their respective Employment Agreements, directly or indirectly solicit any employee of WTW SE or affiliate to work for Alliant or any third party, including any competitor (whether an individual or a competing company) of WTW SE or its affiliates, or induce any such employee of WTW SE or its affiliates to leave the employ of WTW SE or its affiliates.

3. Until further Order of the Court, the Individual Defendants shall not misappropriate WTW SE's Confidential Information. Specifically, the Individual Defendants shall not possess, use or disclose any and all of WTW SE its affiliates' non-public confidential and/or proprietary information and trade secrets owned or possessed by WTW SE and its parent companies and affiliates, including, but not limited to, information regarding any aspect of its or their business, strategic planning, financial information, clients, prospective clients, and employees to which the Individual Defendants had access or which was provided to them by employees of WTW SE during the course and scope of their employment with WTW SE ("Confidential Information") without the consent of WTW SE. These restrictions shall not apply to any information in the public domain provided that none of the Individual Defendants was responsible, directly or indirectly, for such information entering the public domain without WTW SE's consent. The Individual Defendants shall not delete, destroy, erase, modify, or otherwise alter any and all electronic media, including, but not limited to, work and personal e-mail accounts, external hard drives, thumb drives, or other portable media, network drives, computers, cellular phones, smart phones, and personal digital assistants, that have stored WTW SE's documents or information, or were used to transfer or temporarily store WTW SE's Confidential Information and shall return the same to WTW SE within ten (10) days of this Order.

4. Pursuant to Fed. R. Civ. P. 65(c), WTW SE is directed to post a cash or surety bond in the total amount of $100,000.00. The Court notes that WTW SE already posted this security bond on July 1, 2022.

5. Pursuant to Fed. R. Civ. P. 65(d)(2), this restraining order is binding upon the parties to the action, their officers and agents, servant, employees, and attorneys, and upon other persons who are in active concert or participation with them and who receives actual notice of the restraining order or injunction by personal service or otherwise.

6. This Order shall issue immediately and remain in effect until otherwise dissolved or modified by the Court.

7. The Court shall retain continuing jurisdiction over the Parties and subject matter to enforce the terms and conditions of this Order.

IT IS SO ORDERED.

Signed: July 6, 2022

Frank D. Whitney
United States District Judge